NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0778n.06

No. 09-1820

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Nov 21, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| DENNIS W. DELANEY, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before: MOORE and KETHLEDGE, Circuit Judges; and MARBLEY, District Judge.[*]

**ALGENON L. MARBLEY, District Judge.** In this criminal action tried to a jury, Defendant-Appellant Dennis Delaney appeals his conviction of sexual exploitation of children, distribution of child pornography, and possession of child pornography. Delaney appeals his conviction of four charges in a four-count indictment. He alleges three errors: (1) that the district court erred in admitting statements in violation of his Fifth Amendment rights because they were involuntary and taken after he unambiguously requested a lawyer; (2) that the district court erred in admitting evidence of internet chat transcripts with undercover police officers; and (3) that the district court erred in denying his Rule 29 motion for acquittal. Because the district court did not err, We **AFFIRM** Delaney's conviction.

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

## I. BACKGROUND

### A. Procedural History

On September 3, 2008, a grand jury returned a four count Superseding Indictment charging Defendant Dennis William Delaney with the following offenses: Count I, Sexual Exploitation of Children, 18 U.S.C. § 2251(a); Counts II and III, Distribution of Child Pornography, 18 U.S.C. § 2252(a)(1); and Count IV, Possession of Child Pornography, 18 U.S.C. § 2252(a)(5)(B). On November 20, 2008, a jury found Delaney guilty as charged. The district court sentenced Delaney to 300 months for Count I, 180 months for Counts II and III, and 120 months for Count IV, to be served concurrently.

### B. Factual Background

In 2002, Delaney began chatting with Amanda Schmidt on the internet in a science chatroom. At the time, she was 12 or 13 years old, but had listed her age on her Yahoo! profile as 18 years old. Before long, the two were communicating regularly over the internet using instant messaging. Amanda indicated that Delaney communicated with her using the screen names "Z Camaro Guy" and "Mich Guy 2482000." In 2004, when Amanda Schmidt was 14 years old, she met the defendant, then a 32-year-old man, at a local mall. At the mall, Delaney made plans to meet Amanda for sex in her home in Grand Rapids.

When Delaney came to Grand Rapids to meet Amanda for this sexual encounter, he brought a camera and red latex body paint. After the two engaged in sexual intercourse, Delaney used the paint to write the words, "Dennis Was Here, 2004" above Amanda's genitals. Amanda, in turn,

painted her name above the Delaney's genitals. Delaney took naked pictures of Amanda with the latex paint on her genital area, as well as when she later emerged from a shower.

In August of 2004, Amanda's mother, Linda Joy Schmidt, observed Amanda get into a vehicle and asked where Amanda was going, to which Amanda stated she was going to Detroit. Amanda then accompanied Delaney to his home in Detroit. Linda Schmidt searched Amanda's address book and found the name Dennis in her address book with a Detroit area code. When Linda Schmidt called the number, her daughter called back and Ms. Schmidt demanded that her daughter come home. Amanda returned home and would later admit that she was with Delaney.

On September 2, 2004, City of Walker Police Officer Andrew Veen observed a Camaro pull into a church parking lot at 1:00 a.m. Officer Veen established that Delaney was driving and Amanda was in the passenger seat. Amanda had no I.D., but told Officer Veen that she was 14 years old. Officer Veen would testify that Delaney insisted that he believed her age to be 18. An officer arrested Delaney and another officer drove Amanda home to her mother.

In November of 2004, Amanda and her friend, Katie, met Delaney and took more pictures. At trial, Amanda identified a topless picture taken of her by Delaney, and stated that she sent them to herself via e-mail from his computer. On another occasion, Amanda indicated that her brother drove her to Delaney's house, where Delaney and Amanda again engaged in sex.

In October of 2003, Wyandote Police Detective Richard Weise posed as a mother with a five-year-old daughter, and began to have online chats with "Z Camaro Guy." Detective Weise testified that "Z Camaro Guy" sent pictures of himself and his car to the Detective and that they discussed sex.

3

In 2007, FBI Agent Jenny Emmons posed online as a female seeking an adult male for a relationship with her minor children and was contacted by "Z Camaro Guy." Agent Emmons testified that "Z Camaro Guy" asked questions about her minor children, and stated he was interested in young girls 10 and older. When asked about "limits," he responded "none" and stated that he loves the velvet feeling of the younger. They exchanged pictures, and "Z Camaro Guy" claimed to have had "experience" with someone as young as 14 years old. Agent Emmons identified the screen names used as "D Delaney 70" and "Mich Guy 2482000," and indicated that she stopped her investigation once she learned that Detective Linda Findlay was also communicating with and taking a lead role in the investigation of Delaney.

In June of 2007, Macomb County Detective Linda Findlay began posing online as "Jessica," a mother with a 3 year old boy and a 5 year old girl. Detective Findlay used the online identity "Yaeger Loving Mom" and her profile stated she was interested in "family love" and others interested in such activity. Detective Findlay testified that "family love" was a term used by people interested in sex with children.

Delaney chatted with "Jessica" online as "Z Camaro Guy." While on his cell phone, Delaney told her that he was about to be a father and that he wanted to learn about "family love." Detective Findlay asked what Delaney wanted to do with her daughter, whereupon he allegedly stated that he was unsure, but then stated "oral for sure." When Delaney allegedly asked what the 5 year old's experience was, Detective Findlay stated "oral and some penetration." Delaney again spoke with Detective Findlay on October 26, 2007, where he allegedly stated that he wanted the five-year-old

to sit on his lap; kiss, hug, remove clothing; then engage in oral sex and penetration. She testified that Delaney asked her to visit a "pro-incest" website, and talked about a child porn site.

Once cell phone numbers were exchanged, Detective Findlay obtained a search warrant for the Defendant's cell phone subscriber information. Additionally, authorities requested Yahoo! Inc. to produce documents (subscriber information, contents of e-mails and photographs) in connection with Yahoo! User I.D. "Mich Guy 2482000." Yahoo! Inc. provided the requested information.

Delaney arranged to travel and meet "Jessica" and her two fictitious young children. Detective Findlay chose an undercover apartment in Harrison Township, Michigan, for the meeting. On November 1, 2007, Delaney arrived, knocked on the door and was detained by officers, who seized his camera phone. After being informed of his rights, Delaney stated that he went to the apartment in an effort to determine if "Jessica" was real, so he could turn her into the authorities. Delaney subsequently stated that he probably would have taken the five-year-old girl to breakfast, and although he had a "kink," he did not like girls that young.

Detective Chris Kohlmeyer of the Macomb Computer Enforcement Team engages in undercover online investigations, and testified that he had "chats" with both "Z Camaro Guy" and "Mich Guy 2482000" in the past. Detective Kohlmeyer ended his contact with Delaney when he learned that Detective Findlay had been chatting with him in her undercover capacity. Detective Kohlmeyer participated in the arrest of Delaney at the apartment in Harrison. Delaney's arrest led to a search of his email accounts, his residence, and the computers in his home. Police removed CDs, floppy disks, computers and Amanda Schmidt's High School I.D. from his residence.

Secret Service Agent Eric Clark searched Delaney's laptop, cameras, disks, and CD-ROMs. Agent Clark located eight pictures showing Amanda Schmidt nude and displaying her genitals with the words "Dennis Was Here, 2004." Secret Service Special Agent Chad Cable found computer chats between "Yeager Loving Mom" and "Z Camaro Guy," and between Dennis Jay and Delaney. Additionally, Agent Cable found 53 "child exploitation" images and the pictures of Amanda Schmidt. Agents Clark and Cable determined that the CDs and videos seized by Macomb County Police matched the thumbnail images on Delaney's computer.

Dennis Jay, a cooperative witness for the defense, testified that Delaney sent him a picture over the internet of a woman's genitals with the words "Dennis Was Here, 2004." Dennis Jay also testified Delaney believed that a "hacker" might have invaded his (Delaney's) computer. Agent Cable examined the electronic evidence and found no evidence of hacking.

Adam Kelly, a computer expert, conducted an independent analysis of the electronic evidence in the possession of the Secret Service. Mr. Kelly discovered that the laptop was purchased on January 27, 2004, and that the registered owner was Hal Cantor. Delaney testified that he worked for a biomedical research company, and that Hal Cantor (who committed suicide on July 11, 2005) was his supervisor. After Mr. Cantor's death, Delaney obtained Mr. Cantor's laptop. Mr. Kelly testified that the computer records showed the operating system was re-installed on March 28, 2006. While Mr. Kelly verified child pornography images were on the computer, he found no creation dates. Finally, Mr. Kelly indicated that the metadata on the CDs indicate that they were burned using Pixmo SDIC software, but no such software was on Delaney's computer.

On January 17, 2008, United States Secret Service agents arrested Delaney.

6

Following his arrest, Special Agents Eby and Clark transported him from his Northville home to the department field office in Detroit. Agent Eby testified that Delaney did not ask for a lawyer prior to leaving the house. Agent Clark testified that during the thirty-minute drive from Delaney's house to the office, he read Delaney his *Miranda* warnings from a card in his pocket. Delaney testified that Clark read him an abbreviated version of the form. According to Clark, Delaney was silent for ten minutes, and then indicated that he knew his rights and began to talk. While both agents testified that he did not ask to speak to a lawyer during the drive, Delaney testified that he asked several times. When they arrived at the station, Delaney was processed. Agent Clark continued to question him for a 30 to 45 minute period. During the car ride and the processing, Agent Clark discussed with Delaney the federal sentencing Guidelines and Clark's notion of "cooperation points." The more points Delaney was awarded, Clark told him, the more likely he was to get time taken off his sentence. Delaney testified that he said that he should be talking to an attorney, but the agents told him that there would be time for that later.

During processing, Agent Clark showed Delaney a *Miranda* form. Clark testified that he probably told Delaney that he would gain cooperation points that would increase his chances of going home on the date of his arrest if he signed the *Miranda* form. After reviewing the form, Delaney was not sure whether he wanted to sign. But after Clark told him that he would both write on the form that Delaney refused to sign and take away his cooperation points, Delaney signed the written *Miranda* form.

Agent Clark showed Delany pictures of Amanda. At this point, Delaney said, "I think I should talk to a lawyer, what do you think?" Agent Clark testified that he responded that if Delaney

wanted to talk to a lawyer, he could. Both agents testified that he never followed up on his question, and instead began to talk.

Delaney filed a motion to suppress his statements, arguing that his statements were involuntary and that he had asked for a lawyer seven times. While in custody, he had admitted knowing Amanda, having sex with her at her house, and photographing her naked body. The district court denied his motion. The court found that the agents sufficiently informed Delaney of his *Miranda* rights and obtained his statements through legitimate means. The court also determined that Delaney's assertion that he unambiguously invoked his right to counsel on numerous occasions was not credible.

On November 20, 2008, a jury convicted Delaney of one count of Sexual Exploitation of Children, two counts of Distribution of Child Pornography, and one count of Possession of Child Pornography. The district court sentenced Delaney to 300 months for Count I, 180 months for Counts II and III, and 120 months for Count IV.

## II. DISCUSSION

## A. SUPPRESSION OF STATEMENTS

Delaney argues that statements he made to officers after his arrest were: (1) involuntary because they were obtained through threats and promises of leniency in violation of the Fifth Amendment; and (2) obtained in violation of his Fifth Amendment right to counsel.

### 1. Standard of Review

In reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error, and its conclusions of law de novo. *United States v. Hurst*, 228 F.3d 751, 756 (6th

Cir. 2000). "In determining the voluntariness of a confession, a reviewing court will not disturb the trial court's findings concerning specific events surrounding the confession unless clear error appears on the record." *United States v. Wrice*, 954 F.2d 406, 410–11 (6th Cir. 1992). Moreover, in reviewing a district court's denial of a motion to suppress an involuntary statement, we must view the evidence in the light most favorable to the government. *United States v. Fowler*, 535 F.3d 408, 417 (6th Cir. 2008).

## 2. Law and Analysis

### a. Voluntariness

Delaney challenges the voluntariness of his confession, which was made subsequent to his *Miranda* waiver. He argues that the police did not advise him of his complete *Miranda* rights, and that their threat of "cooperation points" amounted to coercion.

Involuntary or coerced confessions are inadmissible at trial, *Lego v. Twomey*, 404 U.S. 477, 478 (1972), because their admission is a violation of a defendant's right to due process under the Fourteenth Amendment, *Jackson v. Denno*, 378 U.S. 368, 385–86 (1964). A confession is involuntary if it is not "'the product of a rational intellect and a free will.'" *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)); *see also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). A "necessary predicate" to finding a confession involuntary is that it was produced through "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Coercive police activity can be the result of either "physical intimidation or psychological pressure." *Townsend*, 372 U.S. at 307, *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *see also Blackburn*, 361 U.S. at 206 ("[C]oercion can be mental

9

as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition.") We have "established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

The first prong of the *Mahan* test asks whether the agents' statements were objectively coercive. A promise of leniency in exchange for cooperation may be a relevant factor in determining whether a confession was involuntary. *See United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 2002) (holding that "[a] promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary"). Nevertheless, such statements usually are permissible. *See Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991) (noting, "we have no doubt that effective interrogation techniques require, to some extent, a carrot-and-stick approach to eliciting information from an uncooperative suspect"), *rev'd on other grounds*, 507 U.S. 680 (1993). In general, such promises are coercive only "if they are broken or illusory." *United States v. Johnson*, 351 F.3d 254, 262, n.1 (6th Cir. 2003) (defining an illusory promise as "a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action"); *see also Williams*, 944 F.2d at 289–90 (holding that confession was coerced because police told suspect that if he told the truth about his role in the murder, he would not be charged, but if he didn't talk, he would be charged with murder).

We have found that "promises to inform a prosecutor of cooperation do not, *ipso facto*, render a confession coerced." *United States v. Stokes*, 631 F.3d 802, 809 (quoting *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005)); *accord United States v. Shears*, 762 F.2d 397, 401–02 (4th Cir. 1985); *United States v. Robinson*, 698 F.2d 448 (D.C. Cir. 1983); *United States v. Curtis*, 562 F.2d 1153, 1154 (9th Cir. 1977), *cert. denied*, 439 U.S. 910 (1978); *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir. 1974), *cert. denied*, 419 U.S. 1032 (1974); *United States v. Springer*, 460 F.2d 1344, 1347 (7th Cir.1972). Similarly, promises "to recommend leniency" or "speculation that cooperation will have a positive effect" do not make subsequent statements involuntary.[1] *Wiley*, 132 F. App'x at 640 (quoting *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1995)).

Here, the agents explained to Delaney that if he cooperated and told the truth, he would get more points off his ultimate sentence under the federal Sentencing Guidelines. They also explained that his chances of going home that day were greater if he cooperated. Certainly, the agents made these statements with the intent to compel Delaney to testify, but they were not false. The agents did not inform Delaney that he did not have to accept responsibility *at that time* to receive the sentence reduction, but the absence of this information does not render the statements illusory.

---

[1] In *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), the Ninth Circuit noted that an officer's representation that he would tell prosecutors that a defendant had failed to cooperate would violate a defendant's Fifth Amendment right to remain silent. *Id.* at 1336 n.5. Here, Delaney testified that the agent told him that he could gain or lose points based on his degree of cooperation. The agent backtracked on this a bit, testifying, "No, I wouldn't say lose points, I told him you can gain points based on cooperation, you can gain points for cooperation." On a spectrum from cooperation to failure of cooperation, losing points tends toward the failure end but does not amount to an explicit threat of a longer sentence. *See United States v. Harrison*, 34 F.3d 886, 891–92 (9th Cir. 1994) (holding that "there are *no* circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor"). Additionally, given that the district court credited the agents' testimony over Delaney's, the "losing points" comments do not support a finding of false, illusory promises or coercion.

Without more, these statements were permissible promises of possible leniency. *See, e.g., Wiley*, 132 F. App'x at 640 (holding that promises to inform prosecutor of defendant's cooperation and suggestions of leniency were not coercive); *Wrice*, 954 F.2d at 411 (holding that comments that the Sentencing Guidelines allowed for downward departure motions if the defendant cooperated were not coercive). In the absence of objectively coercive police activity, this Court does not have to consider the remaining two prongs of the *Mahan* standard. *See Connelly*, 479 U.S. at 167. Accordingly, as the challenged statements were not coercive, we find that Delaney's statements were not the result of illegitimate police coercion, and thus were voluntary.

### b. Fifth Amendment Right to Counsel

Delaney argues that the agents refused his repeated requests for counsel during custodial interrogation, which violated his Fifth Amendment right to counsel.[2] The district court found that Delaney's testimony that he requested counsel seven times was not credible, and credited the agents' testimony. The trial court credited one of Delaney's comments—"I think I should talk to a lawyer, what do you think?"—and found that it was not an unambiguous request for counsel.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held the police must immediately stop questioning a suspect if he invokes his right to counsel. *Id.* at 482. The invocation must be "unambiguous;" it cannot be "ambiguous or equivocal." *Davis v. United States*, 512 U.S. 452, 459 (1994). In other words, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the

---

[2]Delaney argues that this issue arises under the Sixth Amendment. He is incorrect. The right to counsel during custodial interrogation is a Fifth Amendment right, and we proceed on that basis. *See Edwards v. Arizona*, 451 U.S. 477, 480 n.7 (1981) (noting that "the Sixth Amendment right to counsel arises whenever an accused has been indicted or adversary criminal proceedings have otherwise begun").

statement to be a request for an attorney." *Id.*

In *Davis*, the Supreme Court found that the defendant's statement, "Maybe I should talk to a lawyer," was not an unambiguous request for counsel. *Id.* at 462. Relying on *Davis*, this Court has held that "[i]t would be nice to have an attorney" is not an unambiguous request. *Ledbetter v. Edwards,* 35 F.3d 1062, 1070 (6th Cir. 1994); *see also Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000) (holding that "I think I need a lawyer" was not an unequivocal request); *Clark v. Murphy*, 331 F.3d 1061, 1069–72 (9th Cir. 2003) (holding that "I think I would like to talk to a lawyer" was not an unequivocal request); *Cf. Abela v. Martin*, 380 F.3d 915, 925–27 (6th Cir. 2004) (holding that statement "maybe I should talk to an attorney by the name of William Evans" and showing business card to officer was an unambiguous invocation of counsel). Here, Delaney stated "I think I should talk to a lawyer, what do you think?" Agent Clark responded that the decision was up to him, and that he had to let the agents know if he wanted a lawyer. Delaney did not make any additional comments about a lawyer at this time, and the agents continued processing Delaney.

In comparison to *Davis* and its progeny, both of Delaney's statements are ambiguous requests for counsel. Neither clearly indicates that Delaney would only deal with the police with counsel present. Both contain the ambiguous phase, "I think," as opposed to more declarative statements. Accordingly, we find that Delaney's requests are not unambiguous, and thus were not obtained in violation of his Fifth Amendment right to counsel.

## B.  ADMISSION OF INTERNET CHAT TRANSCRIPTS

Delaney argues that the district court erred when it admitted several Internet chat transcripts at trial pursuant to Rule 404(b).

### 1. Standard of Review

A district court determines the admissibility of evidence under Rule 404(b) pursuant to a

three-step process:

> *First*, the district court must decide whether there is sufficient evidence that the other
> act in question actually occurred. *Second*, if so, the district court must decide whether
> the evidence of the other act is probative of a material issue other than character.
> *Third*, if the evidence is probative of a material issue other than character, the district
> court must decide whether the probative value of the evidence is substantially
> outweighed by its potential prejudicial effect.

*United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003) (citing *United States v. Haywood*, 280

F.3d 715, 719–20 (6th Cir. 2002)).

We typically review a district court's evidentiary rulings for an abuse of discretion. *United

States v. Ganier*, 468 F.3d 920, 925 (6th Cir. 2006). However, we review the district court's

admission of Rule 404(b) prior acts evidence under the three step analysis we announced in *United

States v. Gessa*, 971 F.2d 1257, 1261–62 (6th Cir. 1992) (en banc). First, we review for clear error

the district court's factual determination that the other acts occurred. Second, "we review de novo

whether the district court made 'the correct legal determination' that the evidence was admissible

for a legitimate [404(b)] purpose." *United States v. Johnson*, 27 F.3d 1186, 1190 (6th Cir. 1994),

*cert. denied*, 513 U.S. 1115 (1995) (quoting *Gessa*, 971 F.2d at 1262). Third, we review for abuse

of discretion the determination that the probative value of the evidence is not substantially

outweighed by unfair prejudicial impact. *United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000).

### 2. Law and Analysis

Federal Rule of Evidence 404(b) allows the government to introduce evidence of "other

crimes, wrongs, or acts" committed by the defendant so long as the evidence is not used merely

to show propensity and if it "bears upon a relevant issue in the case." *United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000). The Rule contains a non-exhaustive list of possible purposes: "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . ." Fed. R. Evid. 404(b). Such evidence "is not admissible to prove the character of a person in order to show action in conformity therewith." *Id.*

### a. Sufficient Evidence That Other Acts Occurred

First, we must determine whether there is "sufficient evidence to support a finding by the jury that the defendant committed" the other act. *Huddleston v. United States*, 485 U.S. 681, 685 (1988). The fact that the chats occurred is undisputed, so step one is not at issue in this appeal.

### b. Proper 404(b) Purpose

Second, we must determine whether the chat transcripts were offered for a proper 404(b) purpose. The transcripts consisted of instant message conversations with three undercover police officers: Detective Linda Findlay, Detective Richard Weise, and Special Agent Jenny Emmons. The government argues that the evidence demonstrated Delaney's identity, knowledge, intent, and absence of mistake or accident. Considering identity first, Rule 404(b) allows the introduction of other acts evidence to show identity, "provided they are 'of sufficient distinctive similarity' with the charges in the indictment to 'create a pattern or modus operandi.'" *United States v. Allen*, 619 F.3d 518, 524 (6th Cir. 2010) (quoting *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006)). While the district court did not rely on these grounds to admit the evidence, we may affirm the admission of evidence on an alternative theory if that theory would justify the admission. *See City Mgmt. Corp. v. United States Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994) (finding that this Court may

15

affirm on any grounds supported by the record, even though they may be different than those relied upon by the district court). At trial, the government alleged that Delaney met Amanda, the victim in this case, on the Internet and communicated regularly with her using instant messaging from the screen name "Z Camaro Guy." Delaney's interactions with the three undercover police officers were the same: He met them on the Internet, communicated with them on instant messaging using the screen name "Z Camaro Guy," and sent them pictures of himself. These interactions indicate a pattern of behavior that is consistent with the charged offense. Accordingly, the evidence was admissible for purposes of identity. *See Perry*, 438 F.3d at 648 (affirming admission of other acts evidence that established a distinctive "signature").

Next, the government argues that the evidence was demonstrative of Delaney's knowledge and intent. This step is governed by *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994), *cert. denied*, 513 U.S. 1115 (1995), in which this Court held that "where there is thrust upon the government, either by virtue of the defense raised by the defendant or by virtue of the elements of the crime charged, the affirmative duty to prove that the underlying prohibited act was done with a specific criminal intent, other acts evidence may be introduced under Rule 404(b)." In this case, the government was required to show that Delaney intended to knowingly produce, possess, and distribute images of child pornography. 18 U.S.C. § 2251(a), 2252A(a)(2), and 2252A(a)(5)(b).

In the chat transcripts, Delaney discussed his sexual interest in young girls, prior possession of child pornography, using his camera to take child pornographic photos, and his knowledge of a file sharing program through which images of child pornography were available for download. In addition, he transmitted images of young girls in bathing suits. All of these statements and acts are

16

indicative of Delaney's intent and knowledge to possess and distribute child pornography. They explain both his interest in the subject, and his past activities to procure it. Accordingly, this evidence was admissible for purposes of intent and knowledge because the acts involved a pattern of particular behaviors that were specifically related to the charged offense. *See United States v. Bell*, 516 F.3d 432, 443 (6th Cir. 2008) (holding that Rule 404(b) evidence is probative of intent only "when the prior [acts] were part of the same scheme or involved a similar modus operandi as the present offense"); *United States v. Hall*, 202 F.3d 270 (table), 2000 WL 32010, at *3 (6th Cir. 2000) (holding that evidence of prior conviction, nude images of children, and sexually explicit emails were admissible to show defendant's intent and knowledge to receive child pornography).

Finally, the government argues that the evidence is probative of absence of accident or mistake. In order for evidence of other acts evidence to be admissible for this purpose, the defendant must assert a defense based on some form of mistake or accident. *See United States v. Newsom*, 452 F.3d 593, 606 (6th Cir. 2006) (finding absence of mistake not to be a permissible purpose in a felon in possession case, when the defendant's only defense was that the gun was not his and that he did not know that it was under his seat); *United States v. Ward*, 190 F.3d 483, 489 (6th Cir. 1999) (finding absence of mistake not to be a permissible purpose for the admission of evidence when the defendant's "defense was not that she mistakenly thought she was selling powdered sugar instead of cocaine"). Here, Delaney testified that he believed Amanda was 18, not 14. This Court has found that mistake of age is not a defense to alleged violations of 18 U.S.C. § 2251(a), *United States v. Humphrey*, 608 F.3d 955, 962 (6th Cir. 2010), but that it is a defense to alleged violations of 18 U.S.C. § 2251A, *United States v. Stout*, 509 F.3d 796, 799 (6th Cir. 2007).

Accordingly, this evidence was admissible for purposes of absence of accident or mistake.

As this evidence was admissible for several permissible purposes, we find that the district court did not err in admitting that the chat transcripts for a proper 404(b) purpose.

### c. Prejudicial/Probative Balancing

Third, we must determine whether any unfair prejudicial impact of the evidence substantially outweighs its probative value. The question before us is not whether the instances described in the chat transcripts are "gruesome or disturbing," *United States v. Boyd*, 640 F.3d 657, 667–68 (6th Cir. 2011), but whether their prejudicial impact is unfair, *see United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996) (noting that the evidence must do more than "paint[] the defendant in a bad light" to be unfairly prejudicial). As the risk of prejudice is unavoidably high in prosecutions for child pornography, caution is required.

The evidence was probative of Delaney's methodology in sending and receiving exploitative photographs, and as to whether he had knowledge that the pornographic images he possessed were of children. Additionally, in making this balancing determination, we must consider whether there are alternate sources of proving the same facts. *See Haywood*, 270 F.3d at 723, *United States v. Merriweather*, 78 F.3d 1070, 1078–79 (6th Cir. 1996) ("One factor in balancing unfair prejudice against probative value under Rule 403 is the availability of other means of proof."). At trial, the government needed to prove Delaney's specific intent and rebut his defense of mistake. Because Delaney testified that he thought Amanda was 18, the government used the chats to counter this defense and show Delaney's sexual interest in children. Due to the limited evidence of Delaney's mental state, the transcripts were the least offensive way of shedding light on his state of mind.

18

Turning to the whether the prejudicial impact was unfair, the chat transcripts at issue describe Delaney's sexual interests, but they contain few graphic details. Because the conversations are less lurid than the conduct involving Amanda, the risk that the jury gave them undue attention is lessened. Balancing is highly discretionary, and thus the district court "is afforded great deference." *Bell,* 516 F.3d at 445. Here, while the transcripts described offensive conduct, the prejudice they may have provoked was not unfair. "'Unfair prejudice' . . . does not mean the damage to the defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Mendez–Ortiz*, 810 F.2d 76, 79 (6th Cir.1986). In light of the evidence of the sexual encounter with Amanda, the chat transcripts did not create the risk of unfair prejudice because of their narrow focus and less explicit nature. Thus, the district court did not abuse its discretion in finding that the prejudicial impact of this evidence did not substantially outweigh its probative value. We find that the evidence was properly admitted.[3]

## C. SUFFICIENCY OF THE EVIDENCE

Delaney argues that there was insufficient evidence to sustain a conviction for Count I, sexual exploitation of children in violation of 18 U.S.C. § 2251(a).

### 1. Standard of Review

Delaney moved for judgment of acquittal on Count I pursuant to Rule 29 of the Federal Rules of Criminal Procedure at the close of the government's evidence. The district court denied

---

[3]The government argues on appeal that the evidence was also properly admissible as res gestae evidence. As we that find that the district court did not abuse its discretion in admitting the evidence pursuant to Rule 404(b), we do not address this argument here.

the motion. Delaney failed to renew this motion at the close of his case, or within seven days of the

verdict. Accordingly, "appellate review is limited to determining whether there was a 'manifest

miscarriage of justice.'" *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998) (quoting *United*

*States v. Glover*, 21 F.3d 133, 138 (6th Cir. 1994), *cert. denied,* 513 U.S. 948 (1994)).

## 2. Law and Analysis

A "miscarriage of justice" exists only if the record is "devoid of evidence pointing to guilt."

*Price*, 134 F.3d at 350 (internal quotations omitted). That standard is not met in this case because

direct and circumstantial evidence supports Delaney's conviction. In relevant part, 18 U.S.C. §

2251(a) provides:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to
> engage in . . . any sexually explicit conduct for the purpose of producing any visual
> depiction of such conduct . . . shall be punished as provided under subsection (e), if
> such person knows or has reason to know that such visual depiction will be
> transported or transmitted using any means or facility of interstate or foreign
> commerce or in or affecting interstate or foreign commerce or mailed, if that visual
> depiction was produced or transmitted using materials that have been mailed,
> shipped, or transported in or affecting interstate or foreign commerce by any means,
> including by computer, or if such visual depiction has actually been transported or
> transmitted using any means or facility of interstate or foreign commerce or in or
> affecting interstate or foreign commerce or mailed.

Delaney argues that the evidence does not prove beyond a reasonable doubt that he

"employed, used, persuaded, or coerced" Amanda. The evidence at trial supports the jury's verdict.

Amanda testified that she met Delaney in an internet chat room when she was in 7th grade. In

August of 2004, he drove to Grand Rapids, Michigan in order to have sex with her. At the time, she

was 14 years old. Amanda testified about the details of their sexual encounter, including how she

and Delaney wrote on each other with red latex paints, and took naked pictures of each other and

their genitals.  In sum, the record is not devoid of evidence of that Delaney "used" Amanda to produce visual depictions of sexually explicit conduct.  Accordingly, we find that there was not a manifest miscarriage of justice in this case.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the Appellant's convictions.  Kethledge, J., concurs in all but Part II.B.1 of this opinion.