RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0128p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 18-5830

*v.*

MICHAEL J.W. POTTER,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 2:17-cr-00012-3—J. Ronnie Greer, District Judge.

Argued: May 2, 2019

Decided and Filed: June 11, 2019

Before: MOORE, SUTTON, and MURPHY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Joseph O. McAfee, MCAFEE & MCAFEE, PLLC, Greeneville, Tennessee, for Appellant. Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Joseph O. McAfee, MCAFEE & MCAFEE, PLLC, Greeneville, Tennessee, for Appellant. Brian Samuelson, J. Gregory Bowman, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

---

## OPINION

---

MURPHY, Circuit Judge. An average "dose" of methamphetamine weighs between one-tenth and one-quarter of a gram. And there are 28.3 grams to an ounce. So Michael Potter confessed to peddling a lot of doses of meth when he told police that he had sold some ten pounds. To make matters worse for Potter, he had been convicted of seven prior drug offenses.

His prior statements about his drug sales supported his conviction for a different conspiracy to distribute methamphetamine that used similar methods.  21 U.S.C. §§ 841(a)(1), 846.  His prior drug offenses supported his mandatory life sentence.  21 U.S.C. § 841(b)(1)(A)(viii) (2012) (amended 2018).

On appeal, Potter challenges his conviction and sentence.  As for his conviction, he argues that the police elicited his statements after he invoked his right to an attorney under *Miranda v. Arizona*, 384 U.S. 436 (1966), and so violated the bright-line rule to stop questioning adopted by *Edwards v. Arizona*, 451 U.S. 477 (1981).  As for his sentence, he argues that the Eighth Amendment bars his mandatory term of life because the child-focused logic of *Miller v. Alabama*, 567 U.S. 460 (2012), should expand to cover adults who commit nonviolent offenses. We disagree with Potter on both fronts, reject his remaining arguments, and affirm his conviction and sentence.

I.

In early 2015, Potter struck a deal with an acquaintance, Tammy Goodson, to make money by selling methamphetamine in east Tennessee.  Goodson would introduce Potter to Nathan Hogan, a Georgia meth supplier, and Potter would reciprocate by giving her a certain amount of money and meth for each ounce he bought from Hogan.  In the first half of 2015, Potter and Goodson twice drove to Georgia to buy between eight and ten ounces of meth from Hogan (or his runner).  After Goodson's arrest, Potter made a third trip during which he bought 20 ounces from Hogan.  Upon each return to Tennessee, Potter went about selling the drugs. About this time, for example, Brandin Hyde contacted Potter in search of a new supplier.  Potter offered Hyde an eventual price discount to undercut Potter's "competition" if Hyde brought repeat business his way.  Yet Potter and Hyde completed just one transaction.

That is because, on June 26, 2015, police arrested Potter on unrelated charges.  That night, he told police he did not want to talk.  The next day, he changed his mind.  After signing a *Miranda* waiver, he spoke with Agents Jason Roark and Shannon Russell from the Tennessee Second Judicial District Drug Task Force.  During this interrogation, Potter admitted that,

starting in August 2014, he had bought about ten pounds of methamphetamine from a different Georgia supplier (not Hogan) and sold it in east Tennessee.

Shortly after his arrest, Potter asked his younger brother, Steven Hilliard, to collect debts from people who owed him. Hilliard recouped funds from several people, including $4,700 from a person who owed Potter for meth purchases. At Potter's urging, Hilliard also contacted Hogan to give him a heads up that Potter had been arrested. That call provided the spark that eventually led Hilliard to take his brother's place in the distribution scheme. During the second half of 2015, Hilliard traveled to Georgia to buy methamphetamine from Hogan using the money he had collected for Potter. Potter was initially upset upon learning of this arrangement, but the brothers ultimately agreed that Hilliard would reimburse Potter in full and pay Potter a "couple of hundred dollars" for each visit to see Hogan. Hilliard bought a pound or two of meth on each trip.

Potter remained in custody during this time, but renewed his distribution efforts soon after his October 2016 release. He contacted Hogan via Facebook, leading to a four-ounce meth purchase. He later bought eight ounces from Hogan. In February 2017, Hogan had arranged to meet Potter for another exchange, but police arrested Hogan on the day of the deal. Potter still completed the transaction through Hogan's runner. Their transactions ended shortly thereafter. The United States indicted Potter and twenty-four others—including Hogan, Goodson, and Hilliard—for a conspiracy starting on or around January 2015 to distribute fifty grams or more of methamphetamine.

Before trial, Potter moved to suppress his statements to Agents Roark and Russell. At a suppression hearing, he testified that he had asked for a lawyer many times during the interview, but the agents ignored his requests. Russell disputed this account. He explained that Potter mentioned a lawyer and "may have" asked whether he needed one, but never requested an attorney or sought to stop the interrogation. The magistrate judge found Potter not credible, held that his statements about an attorney did not require the police to end their questioning, and recommended that the district court deny Potter's motion. The district court adopted this recommendation.

Potter stood trial.  Hogan, Goodson, Hilliard, and Hyde, among others, described his drug distribution.  Roark and Russell also detailed Potter's statements to them.  The jury convicted Potter of the distribution conspiracy.  21 U.S.C. §§ 841(a)(1), 846.  As this was his eighth felony drug conviction, Potter received a mandatory life sentence.  21 U.S.C. § 841(b)(1)(A)(viii) (2012) (amended 2018).

## II.

Potter raises four objections.  He asserts a constitutional, an evidentiary, and a sufficiency challenge to his conspiracy conviction, and a constitutional challenge to his life sentence.

1. *Fifth Amendment Objection*.  Potter starts off with the Fifth Amendment, which gives an individual the right not to "be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court safeguarded this right by prescribing judicial rules of the road for officers who interrogate individuals in police custody, including that the individuals have a right to an attorney during the inquiry.  *Id.* at 473–74.  Potter's argument in this case concerns a second prophylaxis that the Court later adopted in *Edwards v. Arizona*, 451 U.S. 477 (1981), to protect the *Miranda* right to an attorney that protects the Fifth Amendment right against self-incrimination.  *Edwards* held that the police must immediately cease questioning if a suspect invokes the *Miranda* right.  *Id.* at 484–85.  It thus invalidated a suspect's waiver of the right because—even if knowingly and voluntarily made—the waiver arose from questioning after a request for a lawyer.  *Id.* at 487.  Courts enforce *Edwards*'s "second layer of prophylaxis" through "the threat of suppression," *Davis v. United States*, 512 U.S. 452, 458, 461 (1994) (internal quotation marks omitted), so much depends on whether statements about an attorney trigger *Edwards*'s bright-line rule to stop questioning.  Here, for example, Potter argues that the district court should have suppressed his statements about his distribution of ten pounds of methamphetamine because, contrary to *Edwards*, Roark and Russell obtained those statements after Potter had invoked his *Miranda* right.

We begin with a question about the standard of review.  Refusing to credit Potter's testimony that he had requested a lawyer many times, the magistrate judge (whose report the

district court adopted) made several factual findings about what Potter told the agents. The judge then held that Potter's statements did not suffice to launch *Edwards*'s rule. We, of course, review for clear error the district court's fact findings about Potter's credibility and what he said to the agents. *United States v. Scott*, 693 F.3d 715, 718 (6th Cir. 2012). And we, of course, review legal questions de novo. *Id.* But where does the ultimate issue—whether a suspect's credited statements sufficiently invoked a right to counsel to trigger *Edwards*—fall on this law-versus-fact divide?

We view it as a legal question (or at least a mixed question of law and fact) subject to de novo review. Circuit precedent supports that conclusion. *See Van Hook v. Anderson*, 488 F.3d 411, 415 (6th Cir. 2007) (en banc); *see also United States v. Wysinger*, 683 F.3d 784, 793 (7th Cir. 2012); *Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir. 2002) (en banc); *Valdez v. Ward*, 219 F.3d 1222, 1232 (10th Cir. 2000). An analogy to the Supreme Court's precedent does too. In the Fourth Amendment context, the Supreme Court has told lower courts to review de novo the ultimate question whether the historical circumstances (viewed from a reasonable officer's perspective) created probable cause or reasonable suspicion. *Ornelas v. United States*, 517 U.S. 690, 696–97 (1996). Its reasoning in that case, we think, covers the ultimate question in this case about whether the historical statements (again viewed from a reasonable officer's perspective, *Davis*, 512 U.S. at 458–59) sufficed to trigger *Edwards*.

On to the merits. The Supreme Court in *Davis* set a high bar to trigger *Edwards*. To compel officers to end questioning, a "suspect must unambiguously request counsel." *Davis*, 512 U.S. at 459. So "ambiguous or equivocal" requests for an attorney do not put reasonable officers on notice that the interrogation must stop. *Id.* *Davis* explained its rationale for this standard when responding to the argument that it might sometimes engender harsh results: "[T]he primary protection" for the Fifth Amendment, *Davis* said, "is the *Miranda* warnings themselves." *Id.* at 460. While *Edwards* added a *second* layer of judicial protection on top of those warnings, *Davis* was "unwilling" to add a *third* one. *Id.* at 462. And *Davis*'s bottom-line holding—that a suspect who said "[m]aybe I should talk to a lawyer" did not unambiguously ask for counsel—confirms that an individual must make a firm request (minus any ambivalent adverbs). *Id.*

*Davis*'s clear command has doomed several *Edwards* claims in our circuit. Take, for example, the statement "I think I should talk to a lawyer, what do you think?" Was that an unambiguous request for counsel? No. *United States v. Delaney*, 443 F. App'x 122, 130 (6th Cir. 2011). How about "'[i]t would be nice' to have an attorney"? Insufficient. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994); *cf. Henness v. Bagley*, 644 F.3d 308, 319–20 (6th Cir. 2011). Or "I really should have a lawyer, huh?" Equivocal. *United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2017); *see also United States v. Amawi*, 695 F.3d 457, 484–85 (6th Cir. 2012). For what it's worth, other circuits have likewise rejected *Edwards* claims based on similar statements. *E.g.*, *United States v. Oquendo-Rivas*, 750 F.3d 12, 19 (1st Cir. 2014); *United States v. Havlik*, 710 F.3d 818, 821–22 (8th Cir. 2013); *Soffar*, 300 F.3d at 594–95; *United States v. Zamora*, 222 F.3d 756, 765–66 (10th Cir. 2000); *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000); *Diaz v. Senkowski*, 76 F.3d 61, 63–65 (2d Cir. 1996).

We have, by contrast, found requests for an attorney unambiguous (triggering *Edwards*) when a suspect told the police that he wanted to be left alone "until I can see my attorney," *Tolliver v. Sheets*, 594 F.3d 900, 923 (6th Cir. 2010), or directed the police to "call his attorney's phone number," *Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2012). We have even reached that result when a person said "maybe I should talk to an attorney by the name of William Evans." *Abela v. Martin*, 380 F.3d 915, 926–27 (6th Cir. 2004), *abrogated on other grounds by Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010). Despite the "maybe" in this statement, we said that the surrounding circumstances—the suspect referred to a specific attorney, the suspect handed the officer the attorney's business card, and the officer said that he would call the attorney—turned what would otherwise be an equivocal request into an unambiguous one. *Id.*; *see Scott*, 693 F.3d at 719–20.

In which camp do Potter's statements fall? They were just as equivocal as the statements from *Davis*, *Delaney*, or *Ledbetter*. The magistrate judge found as a historical fact that Potter, at most, "may have mentioned an attorney." Russell likewise testified that Potter "mentioned" an attorney and "may have . . . asked if he needed one." But Potter "never requested to actually have [an attorney] present" and "never once said that he wanted to stop" the interview to wait for one. Nothing in these credited facts shows that Potter unambiguously requested counsel. The

mere mention of an attorney does not cut it. *Davis*, 512 U.S. at 459. Nor does a question about having an attorney. *Delaney*, 443 F. App'x at 130.

Potter's responses fall short. He largely (if impliedly) fights the district court's credibility findings without attempting to satisfy the clear-error standard. Potter, for example, suggests that the agents violated *Edwards* because he "asked numerous questions about an Attorney and what one might recommend" he say (or not say) during this interrogation. That understanding of Potter's statements comes from his own testimony. But the magistrate judge found his "story" not credible because, among other reasons, Potter claimed that he had been lying to the agents and would have said anything to get out of jail.

Potter also points out that, on the night before the interrogation, he told the agents he did not wish to speak to them. That does not help him either. The agents honored his request, and it was Potter who initiated the exchange with them the next day. Before that interrogation, Potter received *Miranda* warnings and signed a waiver stating that he understood his rights and was "willing to make a statement and answer questions without a lawyer present." As the magistrate judge also found, Potter was "not interested in having an attorney present." He wanted to talk to the agents because "he wanted out of jail" and thought it would help his chances if he did so. All told, the "circumstances surrounding" Potter's statements cement our conclusion because they show that the agents respected the *Miranda* right that *Edwards*'s rule seeks to protect and that Potter nevertheless opted to voluntarily speak with them. *See Abela*, 380 F.3d at 926.

2. *Evidence Objection*. Potter turns to the Federal Rules of Evidence to take a second swing at the admission of his statements. He argues that the district court should have sustained his relevancy and prejudice objections (under Rules 402 and 403) because his statements discussed *different actors* (not individuals charged in the indictment) and an *earlier time* (beginning in August 2014, before the indictment's January 2015 start date). This claim faces stiff standard-of-review headwinds. We review a district court's decision to admit or exclude evidence for an abuse of discretion, leaving it "undisturbed unless we are left with the definite and firm conviction that the district court committed a clear error of judgment." *United States v. Cleveland*, 907 F.3d 423, 435–36 (6th Cir. 2018) (internal quotation marks omitted). No such error occurred here.

Start with the relevance objection. Potter's statements (that he had bought large amounts of meth in Georgia and resold it in Tennessee) had a "tendency to make" it "more . . . probable" that he voluntarily joined the indicted conspiracy, which started at roughly the same time and followed roughly the same methods. Fed. R. Evid. 401(a). Indeed, as evidence experts have long recognized, a prior "bad act" satisfies the relevancy test's low bar even when used to show a person's propensity to commit the indicted crime. *See Old Chief v. United States*, 519 U.S. 172, 180–82 (1997); 1 John H. Wigmore, *Evidence in Trials at Common Law* § 55, at 122–23 (1st ed. 1904). That is why a separate rule—Rule 404(b)—prohibits that use of "bad acts" evidence and why most objections to this type of evidence invoke that rule. *E.g.*, *United States v. Hardy*, 643 F.3d 143, 151–52 (6th Cir. 2011). But Potter opted not to make a Rule 404(b) objection for strategic reasons. Besides, the United States used Potter's statements for reasons allowed by Rule 404(b)(2), such as to prove his intent. *See United States v. Alkufi*, 636 F. App'x 323, 332 (6th Cir. 2016).

Turn to the prejudice objection. The district court properly balanced the "probative value" of Potter's statements against any "unfair prejudice." Fed. R. Evid. 403. His statements fare well under the "two factors" that our cases use to measure a prior act's probative value: The conduct that Potter's statements described was both similar to, and close in time with, the indicted conduct. *See United States v. Asher*, 910 F.3d 854, 860–61 (6th Cir. 2018). The district court's limiting instruction about the narrow uses for this evidence also diminished any *unfair* prejudice by reducing the risk that the jury would put the evidence to an improper purpose. *See United States v. Wright*, 16 F.3d 1429, 1443 (6th Cir. 1994).

3. *Sufficiency Objection*. Potter next invokes Federal Rule of Criminal Procedure 29, arguing that the United States presented insufficient evidence to sustain his conviction. While subject to de novo review on appeal, this claim also must surmount a demanding legal standard: Potter must show that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) (internal quotation marks omitted).

To evaluate the evidence's sufficiency, we must identify the "essential elements" of a conspiracy conviction under 21 U.S.C. § 846. Ever since *United States v. Welch*, 97 F.3d 142

(6th Cir. 1996), dozens of our cases have quoted (and requoted) three elements: "(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *Id.* at 148; *United States v. Hines*, 398 F.3d 713, 718 (6th Cir. 2005). Yet the jury instructions in this case—following our circuit's longstanding pattern jury instructions, Sixth Circuit Pattern Criminal Jury Instruction 14.05(2) (Jan. 1, 2019)—identified two elements: (1) "that two or more persons conspired or agreed to distribute 50 grams or more of methamphetamine," and (2) "that the defendant knowingly and voluntarily joined the conspiracy." Conflict? We see it as a semantic difference. *Cf. Hines*, 398 F.3d at 718. The "participation" element cannot mean an "action" furthering the conspiracy because "proof of an overt act is not required to establish a violation of 21 U.S.C. § 846." *United States v. Shabani*, 513 U.S. 10, 17 (1994). That is not what our cases meant by the term. As best we can tell, this element dates back to *United States v. Christian*, 786 F.2d 203 (6th Cir. 1986), which used the word "participation" to distinguish joining the conspiracy (which our instructions require) with "[m]ere presence at the crime scene" (which our instructions find insufficient). *Id.* at 211. In that sense, "participation" is synonymous with "joinder." So whether phrased as two elements or three, a conviction under § 846 requires an agreement to violate the drug laws, the defendant's knowledge of the agreement, and the defendant's decision to voluntarily join (or "participate in") it.

Could a rational jury find these elements met in Potter's case? We think so. Ample evidence showed an agreement. Keep in mind that "[a]n agreement to violate the drug laws need not be express or formal. A tacit or mutual understanding among the parties is sufficient." *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006) (internal quotation marks omitted). And such an agreement "can be inferred from repeated purchases of large quantities of drugs." *United States v. Sills*, 662 F.3d 415, 417 (6th Cir. 2011). Here, Potter purchased methamphetamine from Hogan on at least six occasions in distribution-level amounts (between 4 and 20 ounces (113 to 566 grams)). Apart from these large transactions, coconspirators described how they agreed with Potter to distribute meth. Goodson agreed to introduce him to Hogan in exchange for money and drugs, and they implemented that deal by traveling to Georgia to make purchases. Likewise, Potter continued his distribution efforts from jail by agreeing to front Hilliard funds to buy drugs from Hogan in exchange for a cut.

The evidence also could lead a rational jury to find § 846's other elements—that Potter knowingly and voluntarily participated in (that is, joined) the conspiracy. Indeed, "once the existence [of] a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight." *Caver*, 470 F.3d at 233. The jury could again rely on the "repeated purchases" and "large quantity of drugs" to infer Potter's intentional participation. *Id.* Not only that, Potter's warning to Hogan that he had been arrested and his speedy reconnection with Hogan upon his release both confirm that he willingly sought to further the conspiracy's distribution goals.

For his part, Potter asserts that this evidence established only a "buyer/seller" relationship between Hogan (seller) and Potter (buyer) and Potter (seller) and Hyde (buyer). True enough, "[a] buyer/seller relationship alone is not enough to establish participation in the conspiracy." *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999). As noted, however, Potter's "repeat" transactions could lead a jury to find more than that insufficient relationship. *United States v. Brown*, 332 F.3d 363, 373 (6th Cir. 2003).

4. *Eighth Amendment Objection*. Potter ends with an attack on his sentence. At the time of his conduct, federal law imposed a mandatory life sentence for defendants who had two prior felony drug convictions. 21 U.S.C. § 841(b)(1)(A)(viii) (2012) (amended 2018). Potter argues that this sentence "inflict[s]" "cruel and unusual punishment[]" in violation of the Eighth Amendment. U.S. Const. amend. VIII. He asks us to extend the holding of *Miller v. Alabama*, 567 U.S. 460 (2012)—that a mandatory life sentence for *juveniles who commit murder* violates the Eighth Amendment, *id.* at 479—to *adults who commit nonviolent crimes*. This argument faces insurmountable obstacles before this court.

Potter's initial obstacle is our court's precedent. To determine whether a term of imprisonment for adults violates the Eighth Amendment, the Supreme Court has adopted a "'narrow proportionality principle'" that requires a defendant to show that the term is grossly disproportionate to the crime. *Ewing v. California*, 538 U.S. 11, 20, 23 (2003) (plurality op.) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997–98 (1991) (Kennedy, J., concurring in part and concurring in judgment)). Applying this principle in 1994, we rejected an Eighth Amendment challenge to the mandatory life sentence required by § 841(b)(1) for defendants

with two or more prior felony drug convictions. *United States v. Hill*, 30 F.3d 48, 50–51 (6th Cir. 1994).

If Potter believes that *Miller* has now superseded *Hill*, we have also rejected similar Eighth Amendment challenges to § 841(b)(1) since that decision. To list a few examples: *United States v. Young*, 847 F.3d 328, 363–65 (6th Cir. 2017); *United States v. Wilson*, 653 F. App'x 433, 447–48 (6th Cir. 2016); *United States v. Watson*, 620 F. App'x 493, 517 (6th Cir. 2015). These cases comport with *Miller*, which reconciled its categorical rule for children with *Harmelin*'s proportionality principle for adults on the ground that "children are different." 567 U.S. at 481. While Potter notes that he was "only thirty-five years old" when charged with his crime, his age still takes him outside *Miller*'s orbit. *See Young*, 847 F.3d at 364.

Potter's next obstacle is our country's continuing traditions. "The propriety of inflicting severer punishment upon old offenders has long been recognized in this country and in England." *Graham v. West Virginia*, 224 U.S. 616, 623 (1912). And recidivism enhancements have continued into recent times. *Ewing*, 538 U.S. at 25 (plurality op.). In 2003, for example, the Supreme Court upheld a prison term of twenty-five years to life for a defendant who stole three golf clubs precisely because of his criminal history. *Id.* at 28–31. To be sure, Potter received a mandatory life sentence. But *Harmelin* upheld an identical sentence for possession of 672 grams of cocaine without even considering prior convictions. 501 U.S. at 1001–09 (Kennedy, J., concurring in part and concurring in judgment). Potter (like Harmelin) distributed large amounts of drugs, but Potter (unlike Harmelin) had seven prior drug convictions to boot.

The democratic tides are turning, Potter replies, identifying as evidence the First Step Act's amendment reducing to twenty-five years § 841(b)(1)'s mandatory minimum for those with two prior drug convictions. First Step Act of 2018, Pub. L. No. 115-391, § 401(a)(2), 132 Stat. 5194, 5220 (amending 21 U.S.C. § 841(b)(1)(A)(viii)). According to Potter, that amendment evinces a recognition that it is better for nonviolent offenders to have the chance to reform and reenter society. Perhaps so. But Potter also conceded that, unlike other changes in the Act, *cf. id.*, § 404, 132 Stat. at 5222, this change does not apply retroactively to him (an issue we thus need not reach). And *Harmelin* reserved this kind of "comparative analysis" between sentences for the "rare case" in which defendants make a threshold showing that their sentence

may be grossly excessive under the Eighth Amendment.　501 U.S. at 1004–05 (Kennedy, J., concurring in part and concurring in judgment).　Potter has not made that showing.　*Id.*　He must look to the People's representatives, not their judges, for any future relief.

\* \* \*

We affirm Potter's conviction and sentence.