RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSEPH SAMIR ZAKHARI,

*Defendant-Appellant*.

No. 22-5328

─────────────────

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:19-cr-00208—Rebecca Grady Jennings, District Judge.

Argued: April 27, 2023

Decided and Filed: October 23, 2023

Before: KETHLEDGE, WHITE, and STRANCH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Michael R. Mazzoli, COX & MAZZOLI PLLCE, Louisville, Kentucky, for Appellant. Terry M. Cushing, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee. **ON BRIEF:** Michael R. Mazzoli, COX & MAZZOLI PLLCE, Louisville, Kentucky, for Appellant. Terry M. Cushing, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee.

WHITE, J., delivered the opinion of the court in which STRANCH, J., joined in full and KETHLEDGE J., joined in Section III only. KETHLEDGE, J. (pp. 21–23), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

WHITE, Circuit Judge. Defendant-Appellant Joseph Zakhari was convicted of attempting to persuade a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b) (Count 1); attempting to transmit an obscene image to a minor, in violation of 18 U.S.C. § 1470 (Count 2); and attempting to produce child pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Count 3). The district court sentenced him to the applicable mandatory minimum term of fifteen years in prison. On appeal, Zakhari argues that the court erroneously denied his motion to suppress his statement to police as obtained in violation of his right to counsel and his motion to dismiss Count 3 as vindictive. Because the suppression motion should have been granted and the district court did not sufficiently consider the claim of prosecutorial vindictiveness, we REVERSE the denial of the motion to suppress, VACATE the conviction, and REMAND for a new trial and reconsideration of the motion to dismiss.

**I.**

**A.**

In May 2019, Zakhari was in the fifth year of an MD-PhD program at the University of Louisville and planned to become a cardiothoracic surgeon. His family was in Maryland, and his school friends had started residencies around the country, so he was lonely. That month, while investigating human trafficking at the Kentucky Derby, a detective with the Kentucky Attorney General's Office created a fake dating profile for "Dani" on the website MeetMe. The profile, which used an image of a female officer when she was in her late teens or early twenties, showed "Dani" was a single, eighteen-year-old female in Louisville looking for "Friendship, Dating, Chat" and that she had an account under the name "boredcrbgirl" on the messaging application Kik. Five days after the profile was posted, Zakhari wrote "Hey" to "boredcrbgirl" on Kik but received no response. He then spent the summer in Maryland and returned to Louisville in the fall.

In October, Zakhari began a spree of messages to sixty-one social-media accounts over three days on MeetMe, Kik, and Badoo (another online platform), including "boredcrbgirl," who was one of the few to respond. He wrote, "Hey. How are you?"; "Bored," she replied. R. 193, PID 1839. Zakhari replied, "Same. And horny," to which "boredcrbgirl" wrote, "LOL. How old are you?" At this point, the following exchange occurred:

| | |
|---|---|
| Zakhari: | 32. How old are you? |
| "boredcrbgirl": | NVM. 15. |
| Zakhari: | Oh. I thought you were older. |
| "boredcrbgirl": | Yeah. |
| Zakhari: | So you don't want to jerk off together? |
| "boredcrbgirl": | Um, like FR? |
| Zakhari: | Yeah. Are you horny? |
| "boredcrbgirl": | WDY think. |
| Zakhari: | Yes. |
| "boredcrbgirl": | LOL. My mom is gonna be here at 12:00. |

R. 193, PID 1839-40.

Zakhari continued chatting with "boredcrbgirl" over the next two days, making lewd suggestions, requesting photographs, and sending pictures of his penis. Among other things, he wrote: "Have toys?"; "You want to fuck in person?"; "Let me see more pics of you first"; "And you fuck older guys?"; "Send me some naughty pics of you"; "Can I see you in underwear?"; "Could you handle my big dick?"; "Do you like giving head?"; "I also want to fuck your ass"; and "Is your pussy shaved? . . . Can I see?" *Id.* at PID 1841, 1843-46, 1849, 1851. "boredcrbgirl" replied, "WDY think?" when he asked about having sex in person, and "Yeah," when he asked about sex with older men, but she never made sexual suggestions of her own. *Id.* at PID 1843. In response to picture requests, "boredcrbgirl" sometimes sent images of the female officer as an adult but never indulged Zakhari's requests for sexual images.

At times, Zakhari expressed doubt about how old "boredcrbgirl" truly was and whether she was real. "Are you a real person?," he wrote, and he asked for "a pic of you doing the peace sign"; he received an image of the officer posing less than a minute later. R. 193, PID 1848.

He expressed confusion about why "boredcrbgirl" was home from school for two days in a row, and he found the shift that "boredcrbgirl" said her mom worked as a nurse odd based on his knowledge of hospitals. When he gave his address, "boredcrbgirl" remarked it was near "Z Bar," and he then asked twice for her age again before "boredcrbgirl" responded, "Told you. 15." *Id.* PID 1854-55. "Are you sure you aren't 18?," he asked; "Nah, I'm sure. LOL," she replied. *Id.* at PID 1855.

Zakhari pushed for "boredcrbgirl" to come to his apartment for sex, but she said she wanted to meet at her place. "Hm. You are underage," he wrote, "I'm just nervous about coming to your place . . . [a]nd fucking a 15 year old." *Id.* at PID 1855, 1857. "If you came over to my place your mom couldn't walk in on us," he explained. *Id.* at PID 1857. Eventually, he suggested she "take an Uber over to my place and ride my hard cock," and she asked, "How long is it to get there?" *Id.* PID 1862-63. They agreed on a plan for Zakhari to send an Uber.

The officer who had posed for the images arrived at Zakhari's residence in the Uber while agents were positioned nearby. "I'm outside," she messaged; "Coming down," he responded. *Id.* at PID 1865. When he met her, he said, "Hey, how are you?," and asked if she was "ready to go upstairs." *Id.* at PID 1905. He was then arrested and brought up to his apartment where officers conducted a search before transporting him to the Crimes Against Children Unit.

The detective who had been messaging with Zakhari interrogated him at the unit, beginning with noting the importance of the questioning and giving the *Miranda* warnings.[1] "Do you understand what I just told you?," the detective asked; Zakhari replied, "Yes sir," and the detective followed up with, "Do you want to talk to me right now?" R. 203, PID 2323. Zakhari put his head in his hands and paused for ten seconds: "I don't know who to call, I don't know if I call my dad or my sister. Oh my god." R. 60, PID 428, Ex. 1 05:43-06:00. He dropped his

---

[1]Zakhari was told: "I have to advise you of your rights because[,] like I said[,] you're in custody obviously, alright, and I know you know that you have those rights[,] so I'm gonna read 'em to you. . . . You have the right to remain silent[;] anything you say can and will be used against you in court. You have the right to have [an] attorney present during questioning[;] if you cannot afford an attorney but desire one the court will appoint one for you at no cost. *You can stop the questioning at any time by refusing to answer further or by requesting to consult your attorney.*" R. 203, PID 2323 (emphasis added).

head again, was silent for another long pause, and said, "I can answer some questions and then maybe call, I don't even know what to think any more, I—I—." *Id.* at 06:05-06:13. The detective interjected, "Yeah, I understand, listen. It's been a big day, right?," and assured Zakhari that he would "help [him] get through this." R. 203, PID 2324.

After Zakhari responded to some basic questions about his name and birth date, the following exchanged occurred:

| | |
|---|---|
| Detective: | And how about your social security number? |
| Zakhari: | Can I call my dad? |
| Detective: | Well, you know, I don't have your phone and I can't give it to you right now. |
| Zakhari: | But you said I can stop at any time and call if I wanted to. |
| Detective: | Yeah, well, is your dad an attorney? |
| Zakhari: | My sister's an attorney. |
| Detective: | Do you wanna call your sister? |
| Zakhari: | Yeah, I mean sh—[2] |
| Detective: | If you want to, yes but that's gonna be the end of us talking. |
| Zakhari: | Well— |
| Detective: | And that's not my rule, that's just the way it is. |
| Zakhari: | I understand I just don't know what more you want me to say. I made a huge mistake if you want me to say that. |

R. 60, PID 428, Ex. 1 07:09-07:45. After this, Zakhari continued to answer the detective's questions and made a series of incriminating statements. He admitted he "decided to communicate with somebody I shouldn't have been communicating with" and admitted he should not have been communicating with the person because she was "a minor" and he was not "under the age of 18." R. 203, PID 2330. "That's illegal," he said; the detective responded, "So I mean like I said obviously you're not a lawyer but I mean you, you have knowledge of the law," and Zakhari said, "Yes sir." *Id.* A few minutes later, Zakhari said, "Sir, I would like my

---

[2]There is a pause of approximately four seconds between Zakhari saying, "Yeah, I mean sh—," and the detective interjecting. R. 60, PID 428, Ex. 1 07:26-07:30.

lawyer at this point." *Id.* at PID 2340. The detective spoke with Zakhari for a few more minutes before allowing him to speak with his father.

**B.**

In November 2019, Zakhari was indicted on two charges: attempting to persuade a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b), and attempting to transmit an obscene image to a minor, in violation of 18 U.S.C. § 1470. In June 2020, the government added a third charge—attempting to produce child pornography in violation of 18 U.S.C. § 2251(a) and (e)—which increased the mandatory minimum punishment from ten to fifteen years.

Zakhari moved before trial to suppress his statements, arguing he had invoked his right to an attorney. The district court found that Zakhari's later statement—"I would like my lawyer at this point"—was a clear invocation of his rights and excluded the remainder of the interrogation. R. 75, PID 710. But the court found that Zakhari had not made "a clear and unambiguous invocation of his right to counsel" earlier when he identified his sister as an attorney and said he wanted to call her. *Id.* at PID 708-10. Thus, the jury was permitted to watch footage of his confession.

Additionally, Zakhari sought to strike the third charge, arguing it was the product of prosecutorial vindictiveness. The district court denied that motion, accepting the government's explanations and finding that the volume and nature of the motions practice to that point showed no reasonable likelihood of vindictiveness.

The jury convicted Zakhari of all charges. At sentencing, the district court noted that Count 3 yielded a "more significant mandatory minimum of 15 years that was not there before" and thus the court was "quite frankly limited in what [it could] do . . . based on the charging decisions." R. 198, PID 2297. The court explained that it had not struck Count 3 because the "standard for that is just incredibly high and so difficult to prove" but acknowledged "there were points made in that which now that I've sat through trial, I kind of understand." *Id.* Specifically, the court said that the interactions were in a single course of conduct and Zakhari's exchange was "probably the same interaction that would have happened if ['boredcrbgirl'] were 16 or 19

or 50" because an exchange of pictures based on trying to learn "who this other person is on the end of the line" while planning a sexual encounter is "all part and parcel . . . of one criminal scheme." *Id.* at PID 2298. For this reason, the court concluded that Count 3 could "have been added at the very beginning of the case" and that "if it was going to be added, it was there all along." *Id.*

Additionally, the court observed that there were "facts that came to light during the trial that definitely caused [the court] some pause." *Id.* at PID 2299. Specifically, the court said:

> I think it's very reasonable to assume . . . that Mr. Zakhari was looking at a website that he believed showed this individual as 18. He asked questions when he got in this next chat and maybe didn't believe the statement . . . that she was . . . 15 right from the start and [he] continued to inquire and ask questions. . . . [N]one of that really made a big difference to the jury based on what the jury instructions were . . . because at the end of the day she was 15, he ordered the Uber, he took that step and went forward.

*Id.* The court found that Zakhari "had an irrational and inappropriate reaction" and everything changed for him from "that one moment which lasted . . . less than an hour." *Id.* at PID 2300. "[He was] not an individual who was seeking out minors," the court said, and "seem[ed] to have almost stumbled into [contact] by not believing the one website connected to the other website." *Id.* PID 2300-01. Accordingly, it found the fifteen-year mandatory minimum "in excess of what would be necessary," expressing regret to be "hand-tied" by Count 3. *Id.* at PID 2304.

## II.

Zakhari argues that the district court erred in denying his motion to suppress the entire interrogation because he invoked his right to counsel when he said he wanted to call his sister, whom he had identified as an attorney. We review a district court's factual findings for clear error and legal rulings de novo, including a ruling on whether a defendant invoked his rights under the Fifth Amendment. *United States v. Potter*, 927 F.3d 446, 450 (6th Cir. 2019).

### A.

Once a person communicates "his desire to deal with the police only through counsel," he is "not subject to further interrogation by the authorities until counsel has been made available to

him." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). "[A]ll questioning must cease." *Smith v. Illinois*, 469 U.S. 91, 98 (1984). This "bright-line prohibition" prevents investigators from "wear[ing] down the accused" in "explicit or subtle, deliberate or unintentional" ways so as to convince him "to incriminate himself notwithstanding his earlier request for counsel's assistance." *Id.* The burden is on the government to show a proper waiver of the right to counsel. *See Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000).

To invoke the right to counsel, the accused must make a "statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (citation omitted).

Any ambiguity must come from the statement itself or what led to it. It is "intolerable" to "[u]s[e] an accused's subsequent responses to cast doubt on the adequacy of the initial request." *Smith*, 469 U.S. at 98-99. "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." *Id.* at 99 (alteration in original) (quoting *People v. Smith*, 466 N.E.2d 236, 241 (Ill. 1984) (Simon, J., dissenting)).

**B.**

The district court found Zakhari's request to call his sister equivocal because, when asked if he wished to call her, he "quickly stammered through the beginning of an affirmative answer" but then expressed "a different thought" by saying "yea—" and then "I mean she" before falling silent. R. 75, PID 710. The court reasoned that this "more closely resemble[d] an attempt to speak with family than a serious request for counsel." *Id.* (alteration in original) (citation omitted). We disagree.

The following facts are informative.  Less than two minutes after hearing his rights, after answering only two short questions, Zakhari asked to call his father, and, when the detective deflected the request by referring to Zakhari's phone, Zakhari stated that he thought he could stop and make a call at any point.  This was a clear reference to the detective's prior statement: "You can stop the questioning at any time by refusing to answer further or by requesting to consult your attorney."  R. 203, PID 2323.  And when the detective responded, "Yeah, well, is your dad an attorney?," Zakhari immediately responded:  "My sister's an attorney."  *Id.* at PID 2325.  He did not say something like, "No, but I'd like to talk to him anyway"; his immediate response was to identify a lawyer he knew.  When the detective asked, "Do you wanna call your sister?," Zakhari responded after less than a second:  "Yeah, I mean sh—."**[3]**  R. 60, PID 428, Ex. 1 07:22-07:27.

With these facts in mind, we disagree with the district court's conclusion that Zakhari's request to call his father was "an attempt to speak with family."  It is true that a valid request must be for "the particular sort of lawyerly assistance that is the subject of *Miranda*," which concerns the defendant's "desire to deal with the police only through counsel."  *United States v. Suarez*, 263 F.3d 468, 486 (6th Cir. 2001) (first quoting *McNeil*, 501 U.S. at 179; then quoting *Edwards*, 451 U.S. at 484).  But we have never suggested that a request is less valid where counsel is family.  Such a rule would be illogical:  It is common sense for a person to seek "lawyerly assistance" from the lawyer they know best and likely the only lawyer whose contact information they know offhand.

Moreover, the factual context shows Zakhari had "lawyerly assistance" in mind.  *See Abela v. Martin*, 380 F.3d 915, 926 (6th Cir. 2004) (analyzing "the circumstances surrounding the statement"), *abrogated on other grounds by Guilmette v. Howes*, 970 F.3d 698 (6th Cir. 2010) (en banc).  By referring to the detective's prior statement that the interrogation could stop at any time, Zakhari specifically indicated he wanted to "stop."  *Cf. Potter*, 927 F.3d at 451 (finding no invocation where defendant "never once said that he wanted to stop").  He asked to call his dad almost immediately after being told he could call an attorney, not a family member;

---

**[3]**Although the district court found that Zakhari said the word "she," our review shows that he only uttered the syllable "sh."  R. 60, PID 428, Ex. 1 07:22-07:27.  Further, he clearly said the full word "yeah," not "yea—."  *Id.*

instantly identified his sister as an attorney when asked if dad was one; and said "Yeah" without hesitation after being asked directly whether he wanted to call her.  Further, the detective understood that Zakhari sought "lawyerly assistance" because he told Zakhari that questioning would cease if he called his sister.  *Cf. Abela*, 380 F.3d at 926 (finding persuasive that officer's actions showed understanding of request for counsel).  Zakhari plainly sought counsel within the meaning of *Miranda*, regardless of his relation to the attorney he wished to contact.

Nor was Zakhari's invocation otherwise ambiguous or equivocal.  True, he said, "I mean sh—" after saying "Yeah," that he did want to call his sister, and he paused for four seconds before the detective interrupted.  But he did not stammer in saying "Yeah," as the district court found.  Nor did he introduce "a different thought"; he had four seconds to contradict the affirmative response given but did not do so.  Rather, "I mean sh—" emphasized the import of his earlier communication:  that he wanted to stop and make a call.  It is common when speaking for people to stop midsentence while still expressing a clear idea, and "a suspect need not 'speak with the discrimination of an Oxford don.'"  *Davis*, 512 U.S. at 452 (quoting *id.* at 476 (Souter, J., concurring)).  Nor must the accused appear unshakeable in his decision or enthusiastic about calling counsel.  *See Smith*, 469 U.S. at 97 (finding invocation based on "Uh, yeah. I'd like to do that"); *Yenawine v. Motley*, 402 F. App'x 997, 998 (6th Cir. 2010) (per curiam) ("I might need to speak with my lawyer about whether I should talk with you."); *Kyger v. Carlton*, 146 F.3d 374, 376 (6th Cir. 1998) ("I'd just as soon have an attorney."); *United States v. Wysinger*, 683 F.3d 784, 790-91 (7th Cir. 2012) ("I mean, but can I call one now?  That's what I'm saying."); *Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011) ("I think I should get a lawyer."); *Cannady v. Dugger*, 931 F.2d 752, 755 (11th Cir. 1991) ("I think I should call my lawyer.").

As made plain in *Abela*, an invocation is sufficient despite a verbal hedge when other elements of the situation establish that the defendant sought to invoke his rights.  Abela said, "maybe I should talk to an attorney by the name of William Evans," 380 F.3d at 926, which is more equivocal than Zakhari's affirmative answer to the direct question whether he would like to call his sister.  This court found Abela's statement clear and unequivocal because the "surrounding circumstances" showed he identified a specific attorney, and the interrogator construed the statement as an invocation.  *Id.*  Those same circumstances are present here.

Zakhari had just identified his sister as an attorney.  And the detective did not need to clarify by inquiring, "Are you seeking her legal advice?"  He understood what Zakhari sought and told him questioning would stop.

For good reason, we are unaware of a case finding no invocation where a defendant replied affirmatively to a direct question about whether he wanted to call an attorney.  We are mindful that the Supreme Court explained in *Davis* that the *Edwards* rule is meant to provide "a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information."  512 U.S. at 461.  In that spirit, the Court explained, "this clarity and ease of application would be lost" with a standard that "require[d] questioning to cease if a suspect makes a statement that might be a request for an attorney."  *Id.*  Under that alternative regime, "officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong."  *Id.*

In this case, Zakhari had already made statements that could possibly have sought to invoke his right to counsel (i.e., "Can I call my dad?" and "[Y]ou said I could stop at any time.") and the detective sought clarity.  The detective then asked Zakhari directly if he wanted to call someone Zakhari had identified as an attorney, and Zakhari said, "Yeah, I mean sh—," before the detective re-engaged with him.  Although ineloquent, this was an affirmative response.  If we required more in this situation, we would essentially invite officers to ask, "But are you really sure?" before the right to counsel is invoked.  Such a standard would drain *Miranda* of meaning and undermine the ease of *Edwards*.  Officers must take defendants at their word if they answer that they would like to speak to an attorney—as the officer did here, R. 203, PID 2325 ("If you want to, yes[,] but that's gonna be the end of us talking")—and cease questioning.

Accordingly, we conclude that Zakhari adequately invoked his Fifth Amendment right to counsel and the district court should have granted his motion to suppress the entirety of his interrogation.

**C.**

We turn to the government's alternative argument that, even if the district court erred in denying the motion to suppress, this error was harmless because of other evidence in the record: the Kik messages, in which "boredcrbgirl" repeatedly stated she was 15; the fact that Zakhari ordered an Uber; and Zakhari's utterances immediately after arrest ("I can't believe how stupid I was" and "What [was] I . . . thinking?"). R. 194, PID 1971.

The admission of the interrogation was not harmless. A constitutional error is harmless if it "appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). As the Supreme Court has cautioned: "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (citation omitted). Given the power of a confession, our review of the evidence, and the district court's observation at sentencing that Zakhari had a plausible defense that he did not actually believe "boredcrbgirl" was underage, the government has not shown beyond a "reasonable doubt" that the confession video did not contribute to Zakhari's conviction. We thus reverse the district court's denial of the motion to suppress, vacate the conviction, and remand for a new trial.

**III.**

Next, Zakhari argues that the district court abused its discretion when it denied his motion to dismiss Count 3, the child-pornography count, rejecting his claim of prosecutorial vindictiveness. This charge, which increased the mandatory minimum by five years, was added on June 17, 2020, seven months after the original indictment was handed down on November 20, 2019.

**A.**

We review for abuse of discretion a district court's decision whether to dismiss an indictment for prosecutorial vindictiveness. *United States v. LaDeau*, 734 F.3d 561, 565 (6th

Cir. 2013). "A district court abuses its discretion 'when it relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment.'" *Id.* at 565-66 (quoting *Schlaud v. Snyder*, 717 F.3d 451, 457 (6th Cir. 2013)). "Because a district court has no discretion not to abide by governing law, an erroneous legal conclusion deserves no deference on appeal." *Id.* at 566. Thus, "a district court commits error requiring reversal if its determination whether to dismiss an indictment for prosecutorial vindictiveness depends upon a misapplication of pertinent law," but "where the district court's dismissal determination hinges upon factual findings, we defer to the district court's decision unless the findings upon which it was predicated are clearly erroneous." *Id.*

The Fifth Amendment forbids the government from punishing defendants for exercising their constitutional and statutory rights. *See United States v. Goodwin*, 457 U.S. 386, 372 (1982). Consequently, defendants may challenge the government's charging decisions for actual or presumptive vindictiveness. *See LaDeau*, 734 F.3d at 566. The latter theory recognizes a rebuttable presumption of vindictiveness if the defendant shows a "realistic likelihood" that a charge was vindictive. *Goodwin*, 457 U.S. at 384 (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). This standard is objective and considers "whether a reasonable person would think there existed a realistic likelihood of vindictiveness," not the "defendant's subjective impressions." *United States v. Andrews*, 633 F.2d 449, 454 (6th Cir. 1980) (en banc).

To assess this likelihood, a court "must weigh two factors: (1) the prosecutor's 'stake' in preventing assertion of the protected right and (2) the reasonableness of the prosecutor's actions." *United States v. Poole*, 407 F.3d 767, 776 (6th Cir. 2005) (quoting *Andrews*, 633 F.2d at 454). Once a reasonable likelihood is found, a presumption arises in defendant's favor and the government must rebut it "with 'objective, on-the-record explanations' such as 'governmental discovery of previously unknown evidence' or 'previous legal impossibility.'" *LaDeau*, 734 F.3d at 566 (quoting *Bragan v. Poindexter*, 249 F.3d 476, 482 (6th Cir. 2001)). This approach "reconcile[s] two conflicting rules of law: 1) prosecutors have and need broad discretion to file charges where there is probable cause that someone has broken the law; 2) vindictive conduct by

persons with the awesome power of prosecutors . . . is unacceptable and requires control." *Andrews*, 633 F.2d at 453.

In *LaDeau*, we affirmed the district court's decision to presume vindictiveness where the defendant won a motion to suppress that "eviscerated" the government's case and then, five days before trial, the government obtained a superseding indictment that changed the prescribed sentencing range from 0-10 years' imprisonment to 5-20 years' imprisonment, and that was also based on a new theory of guilt applied to the same conduct as before. 734 F.3d at 564-63, 569. There was "little reason to suspect that the prosecutor's view of LaDeau's case changed significantly between the two indictments," which occurred thirteen months apart, "given that the government already possessed all of the relevant evidence that supported the superseding indictment well before procuring the first indictment." *Id.* at 565, 568.

**B.**

The parties submitted briefs to the district court on Zakhari's vindictiveness claim and echo their arguments on appeal. Zakhari argued that the addition of a new count substantially increasing his mandatory minimum, without new evidence and after vigorous motions practice, established a presumption of vindictiveness. Specifically, he noted that, before the superseding indictment (in June 2020), he moved to amend his conditions of release on several occasions (in December 2019, February 2020, and April 2020); moved for return of electronic devices (in January 2020); moved to suppress his interrogation (in February 2020); sought discovery of evidence connecting the "Dani" account on MeetMe to the "boredcrbgirl" Kik account (in May 2020); and moved to compel the appearance of the decoy officer—whose identity the government had not revealed—at the suppression hearing (in June 2020). The government opposed all these motions except for Zakhari's first motion to modify his terms of release. Lastly, Zakhari noted that, at the sentencing hearing for a 2007 child-pornography case involving a different defendant, a district court cautioned the same prosecutor against arguing that the defendant should be penalized for using a motion to suppress to assert his constitutional rights.

The government responded by explaining its decision. According to its brief, in January 2020, the prosecutor was on the faculty of a course that discussed charging and sentencing in

child-exploitation cases, and around this time also worked on a case similar to Zakhari's, in that there was an alleged attempt at exploitation and the defendant had requested images. That case involved debate over applying U.S. Sentencing Guideline § 2G1.3(c)(1), which assigns a base offense level of 32 "[i]f the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct." Additionally, in February 2020, the prosecutor reviewed cases from recent sting operations with detectives and resolved to present five indictments to the March grand jury, including Zakhari's superseding indictment. She decided, for "consistency," that "if the defendant asked the undercover for sexually explicit images, an attempted production of child pornography was included rather than relying on the cross reference in U.S.S.G. § 2G1.3(c)(1) to address the conduct." R. 71, PID 552. Because of COVID-19, the grand jury did not convene again until June 17, 2020, when it handed down Zakhari's superseding indictment. The government also provided context for the 2007 case Zakhari pointed to and emphasized that this occurred over a decade before.

The district court found that Zakhari failed to show enough to presume vindictiveness. The court reasoned that Zakhari's pretrial motions were "routine and minimally burdensome filings" and thus "unlikely to prompt a vindictive prosecutorial response," which the court found contrasted with *LaDeau*, where the defendant's successful motion to suppress forced the government to start over, and the government made a new charging decision right before trial. R. 109, PID 850-51 (quoting 734 F.3d at 568). The court further noted that the government's brief explained its delay in adding the charge. The court rejected Zakhari's argument that the court should require evidence, rather than taking the government at its word, and also rejected Zakhari's argument that Count 3 came too late, again noting the government's brief and citing *Goodwin*'s proposition that a "prosecutor's assessment of the proper extent of prosecution may not have crystallized" before trial. *Id.* at PID 852 (quoting *United States v. Branham*, 97 F.3d 835, 850 (6th Cir. 1996)). And the court found that, timeline aside, Zakhari failed to show the prosecutor had a stake in his pretrial motions, given that "it is unrealistic to presume that a prosecutor's response to a pretrial motion is an effort to penalize or deter the defendant" and that *LaDeau* involved a successful motion to suppress. *Id.* at PID 852-53 (quoting *Branham*, 97 F.3d

at 850).  As to the prosecutor's conduct in the 2007 case, the court noted that Zakhari cited no other examples to establish a pattern of vindictiveness and that the case was many years before.

## C.

We conclude that the court abused its discretion in failing to require the government to substantiate its explanations.  Zakhari showed enough to presume vindictiveness and thus the government needed to justify the addition of Count 3 using "objective, on-the-record explanations."  *LaDeau*, 734 F.3d at 566 (quoting *Bragan*, 249 F.3d at 482).  It was not enough to rely on unsupported assertions in the government's brief.

We start with the reasonableness of the prosecutor's conduct, the most salient factor in this case.  A court must be careful about presuming vindictiveness in the pretrial context because prosecutors may "uncover additional information that suggests a basis for further prosecution" or realize that evidence "has a broader significance."  *Goodwin*, 457 U.S. at 381.  But here the government concedes there was no "new knowledge or change in circumstances" before adding Count 3, Oral Arg. 27:50-28:04, and the district court also observed this at sentencing, R. 198, PID 2298 ("[I]f it was going to be added, it was there all along.").

We are also wary of new charges "based on the same conduct underlying [a] charge in the initial indictment," *LaDeau*, 734 F.3d at 570, or new charges that stretch the fabric of the case, *see United States v. Eddy*, 737 F.2d 564, 572 (6th Cir. 1984) (finding presumption of vindictiveness "strengthened" when government brought perjury charges and "the perjurious nature of [the] testimony was not manifest").  In this case, Count 3 was based on conduct that, as the district observed, appears to be part of the same course of conduct charged in Counts 1 and 2, and also that the district court recognized was not by its "nature . . . manifest[ly]" an attempt to produce child pornography, *id.*

True, because the prosecutor here added an "extra charge[] after the exercise of a procedural right," she "arguably act[ed] less vindictively than a prosecutor who substitutes a more severe charge for a less severe one."  *Andrews*, 633 F.2d at 454.  But that fact alone does not erase the reasons to presume vindictiveness; it merely means the presumption might be stronger if a charge had been substituted for something less severe.  And in fact, the addition of

Count 3 does not appear all too different from that scenario because it concerns already-charged conduct and increases the mandatory minimum by half.**4**

As for the prosecutorial stake, although "routine[]" pretrial motions do not generally provide a sufficient basis for vindictiveness, *Goodwin*, 457 U.S. at 381, "[e]ach situation will necessarily turn on its own facts," *LaDeau*, 734 F.3d at 567 (quoting *Andrews*, 633 F.2d at 453-54). To be sure, *Goodwin* mentions several types of motions—to suppress, challenge the sufficiency and form of indictment, plead an affirmative defense, request psychiatric services, obtain access to government files, for a jury trial—and concludes "[i]t is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter." 457 U.S. at 381. But as we have explained, "[t]his list is only illustrative of motions that may typically be expected to cause the government very little responsive burden." *LaDeau*, 734 F.3d at 568. There is no "inflexible presumption" pretrial, not no possible presumption. *Goodwin*, 457 U.S. at 381.

In this case, Zakhari made a plausible showing that the prosecutor had a sufficient stake in deterring his pretrial motions, especially his motion to suppress. Zakhari filed a substantial number of pretrial motions, all but one of which the government strongly opposed, and the suppression motion presented a grave threat to the prosecution's case, much like the suppression motion in *LaDeau*. At stake was footage of Zakhari confessing to knowing that "boredcrbgirl" was fifteen and it was wrong to invite her to have sex because she was underage. As noted, "[a] confession is like no other evidence," *Fulminante*, 499 U.S. at 296, and this video was especially compelling, given the lurid nature of the alleged crime and Zakhari's defense that he did not actually believe "boredcrbgirl" was fifteen. This all makes Zakhari's motion to suppress more consequential than "routine" pretrial motions, even successful motions that force the government to redo its work, because the government would have been highly motivated here to protect the evidence and faced a much tougher trial without it. *See LaDeau*, 734 F.3d at 568 (explaining that, in *United States v. Moon*, "although the government was forced to return twice to the grand

---

**4**We also note that Count 3 did not arise from plea negotiations, a scenario in which "the prosecution may legitimately threaten to bring harsher charges in order to induce a defendant into pleading guilty." *LaDeau*, 734 F.3d at 569 (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363-65 (1978)).

jury to obtain new indictments, it was able to resuscitate its prosecution on charges identical to those originally brought in the initial indictment simply by properly alleging an interstate commerce element" (citing 513 F.3d 527, 533, 536 (6th Cir. 2008)).[5]

To be sure, *LaDeau* is not on all fours with this case. The government here still had the Kik messages, so the government's case would not have been "eviscerated" without Zakhari's confession in the same way as in *LaDeau*, where the defendant successfully suppressed any evidence that he possessed child pornography, 734 F.3d at 569. It was also highly persuasive in *LaDeau* that the motion succeeded and forced the government to start "from scratch," whereas here the motion had not yet been decided, *id.*[6]

However, we still find *LaDeau* compelling. Even if its original case was dealt a "mortal blow," the government in *LaDeau* pivoted to a new theory with relative ease, using evidence already in its possession. 734 F.3d at 569. And although the government here faced only the immediate burden of responding to the motion to suppress, the many parallels between *LaDeau* and this case nevertheless suggest a sufficient prosecutorial stake.[7] *Cf. Andrews*, 633 F.2d at 454 (noting that a "prosecutor's interest in deterring a bail motion is not as great as a prosecutor's interest in deterring appeals to a trial de novo" because "[a] prosecutor who loses a bail motion does not have to retry a case" but emphasizing that "we cannot accept . . . that the prosecutorial stake in a pretrial setting is always so de minimus that there can never be a 'realistic likelihood of

---

[5]The facts in this case also contrast with *Goodwin*, in which the Supreme Court found that the prosecutor had an insufficient stake in deterring the defendant from pursuing a jury trial. 457 U.S. at 383. Although "a jury trial is more burdensome than a bench trial," *id.*, a jury trial does not deprive the government of pivotal evidence, thereby requiring the government to reconsider its theory of the case.

[6]Apart from the issue of prosecutorial stake, we also note that, in *LaDeau*, we affirmed a finding of vindictiveness, and here we consider whether the district court abused its discretion in finding no vindictiveness. However, the district court here seemed to feel it had very little discretion at all, R. 198, PID 2297 (expressing with seeming regret that the "standard for [vindictiveness] is just incredibly high"), and we have previously reversed a district court's decision finding no vindictiveness, *see Eddy*, 737 F.2d at 572.

[7]It is also worth remembering that Zakhari's motion to suppress came amid numerous, non-trivial pretrial motions, almost all of which the government strongly opposed, and at least one motion (the motion to compel appearance of the decoy officer) was necessarily tied to the suppression motion.

vindictiveness'"").  The fact that Zakhari's motion to suppress had not yet been decided does not undermine that the prosecution understood what was at stake.[8]

Additionally, we stress that the prosecutor's stake is only part of the equation and must be considered alongside reasonableness to decide whether "a realistic likelihood of vindictiveness exists."  *Goodwin*, 457 U.S. at 373.  For example, in *Suarez*, where we found no presumption raised by a motion to suppress, we considered that the new charge was not unreasonable because it arose amid plea negotiations and was based on new evidence.  *See* 263 F.3d at 479-80.  And in *LaDeau*, we found precedent on the prosecutorial-stake issue less persuasive because there was "little reason to suspect that the prosecutor's view of LaDeau's case changed significantly between the two indictments."  734 F.3d at 568.  Here, seven months passed between the first indictment and the second, which increased Zakhari's potential mandatory minimum sentence by five years, and there was no "new knowledge or change in circumstances."  Oral Arg. 27:50-28:04.  This was enough, combined with a serious challenge to the government's case, to raise a presumption of vindictiveness that required the district court to conduct a more searching inquiry.

The district court's statements at sentencing give the sense that it too felt there was a risk of vindictiveness but not enough to strike Count 3 because it found that the "standard for [vindictiveness] is just incredibly high and so difficult to prove."  R. 198, PID 2297.  As the district court put it, Count 3 could "have been added at the very beginning of the case" and "if it was going to be added, it was there all along."  *Id.* at 2298.  Although there is a high bar to prove vindictiveness, part of what makes clearing that bar difficult is that, in the instance of presumptive vindictiveness, the government has the opportunity to rebut the presumption.  This is not to say that the threshold to establish a presumption is not high too—it is, particularly in the pretrial setting—but Zakhari showed enough.

Given Zakhari's showing, the government had the burden to rebut "the presumption with 'objective, on-the-record explanations.'"  *LaDeau*, 734 F.3d at 566 (quoting *Bragan*, 249 F.3d at

---

[8]This all said, we are not persuaded by Zakhari's argument about the 2007 case involving the same prosecutor.  We do not dismiss the possibility that a prosecutor's prior conduct may be informative when looking for vindictiveness, but Zakhari's example is unhelpful, given it was one event many years before.

482). By relying on unsupported assertions without permitting Zakhari to test them, the court abused its discretion. This is especially so because, according to the government's assertions, the prosecutor decided to add Count 3 exactly around the time Zakhari filed his suppression motion, and although the prosecutor reconsidered Zakhari's case while reviewing several related cases, the charging decision for "consistency" affected only Zakhari and one other defendant who was not yet charged. To be clear, we do not reach the ultimate question of vindictiveness; we simply remand for the district court to reconsider Zakhari's vindictiveness argument after full development.

## IV.

For the reasons stated, we REVERSE the denial of Zakhari's motion to suppress, VACATE his conviction, and REMAND for a new trial and reconsideration of his motion to dismiss Count 3.

-----------------------------------

**CONCURRENCE / DISSENT**

-----------------------------------

KETHLEDGE, Circuit Judge, concurring in part and dissenting in part. I respectfully disagree with the majority's conclusion that Joseph Zakhari "clearly" and "unambiguously" invoked his right to counsel when Detective Hedden asked him whether he wanted to call his sister. *See Davis v. United States*, 512 U.S. 452, 459-60 (1994). True, in response to that question, Zakhari answered—in part—"Yeah". But the majority reasons as if the "Yeah" were followed by a period. It was not: instead, Zakhari answered, "Yeah I mean sh—", followed by a four-second pause during which he hung his head, looked at the floor, and exhaled.

Hedden had good reason to think that answer was equivocal, not least because it was incomplete. The phrase "I mean" is most commonly used when a speaker intends to clarify, qualify, or otherwise amend what he has just said. *See "I Mean"*, Cambridge Dictionary Online, https://dictionary.cambridge.org/dictionary/english/i-mean (last visited on October 18, 2023) (defining "I mean" as an idiom "used to correct what you have just said or to add more information"). And the interrogation video makes clear that Zakhari's statement—in both tone and inflection—was indecisive and uncertain. That is presumably why Hedden tried to clarify Zakhari's statement, and why Hedden explained that, if Zakhari wanted to call his sister, that would "be the end" of their conversation. Yet even then, Zakhari did not clarify what he "mean[t.]" As measured by dictionaries and body language alike, therefore, Zakhari's statement was ambiguous. *See United States v. Hampton*, 675 F.3d 720, 727-28 (7th Cir. 2012) (suspect's statement "Yeah, I do, but you" followed by a pause was not an unambiguous request for counsel); *United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016) (suspect's statement, "Nah, I don't want to talk man[,] I mean, I—" was not an unambiguous invocation of the right to remain silent). Under *Davis*, Hedden had no obligation to stop questioning Zakhari—and the district court did nor err when it denied his motion to suppress.

\* \* \*

I concur fully, however, in the majority's careful explanation as to why the record in this case supports a presumption of prosecutorial vindictiveness. By way of context, a federal prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all[.]" *Berger v. United States*, 295 U.S. 78, 88 (1935). The obligation to govern impartially concerns, above all, the state's exercise of coercive power—meaning its power to deprive its subjects of life, liberty, or property. A court exercises coercive power through its judgments; in doing so, a judge's obligation is to apply the law evenhandedly, without favoritism toward particular parties or outcomes. A prosecutor exercises coercive power as well: indeed, Robert Jackson said, "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America." Robert H. Jackson, The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys (April 1, 1940). For a court's power is passive, in the sense that the court itself cannot initiate a case. A prosecutor's power is active: "The prosecutor can order arrests, present cases to the grand jury in secret session, and on the basis of his one-sided presentation of the facts, can cause the citizen to be indicted and held for trial." *Id*. Moreover, as a practical matter, in many cases the prosecutor not only recommends a particular sentence, but imposes it—by charging the defendant with an offense that brings a mandatory-minimum sentence.

As a representative of the state, *Berger*, 295 U.S. at 88, a prosecutor's exercise of coercive power must be impartial. Not in a judicial sense, of course: a prosecutor is an advocate, and thus can advocate particular outcomes. And a prosecutor cannot avoid exercising discretion. Prosecutorial resources are limited: and so, every day, prosecutors must decide whether to forbear from pursuing charges for which the case is solid, or whether to pursue questionable charges, or whether to pursue ones that, upon conviction, bring a mandatory minimum. As with a judge, however, a prosecutor's exercise of coercive power should be evenhanded—meaning it should be directed by rules, rather than by the prosecutor's will alone. Those rules might take into account a suspect's willingness to plead guilty, for example, or his recidivism, or exculpatory circumstances, or the gravity of harm to a crime's victims. In all

cases those rules should be applied without favoritism or bias; and in some cases those rules are legally enforceable. Indeed the rule of law itself requires that state coercion be grounded in rules, not will. Accordingly, as a matter of due process, a prosecutor's discretion "in deciding whom to prosecute and which charges to bring is not unfettered." *United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013) (internal quotation marks omitted).

The relevant limitation here is that prosecutorial power may not be exercised vindictively—meaning that the prosecutor may not punish a defendant "for exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982). In Zakhari's case, the original indictment reflected a prosecutorial judgment that, for the conduct at issue, a mandatory-minimum sentence of ten years was enough. Yet seven months later—based on the very same conduct, but after Zakhari's counsel had filed a battery of motions in his defense—the prosecution chose to bring an additional charge, which the district court regarded as a stretch, and which brought a mandatory minimum of 15 years. That decision, on this record, reflected a "reasonable likelihood of vindictiveness[.]" *Id*. at 373. And to rebut that inference, the government was required to offer more than mere assertions in its briefs. The prosecution is entitled to no deference on questions of fact. Instead, the prosecution must come forward with evidence—which the district court, in the first instance, can find credible or not.